UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

**KYLE KILGORE**,

                Plaintiff,

        -against-

**THE COUNTY OF ONONDAGA, DUSTIN SADDOCK, THOMAS FODARO III, ETHAN PERRY, ERIK FRANCIS, JAMES SCHMUNK,**

                Defendants.

Case No.:   9:25-cv-788 (ECC/MJK)

**COMPLAINT**

Plaintiff KYLE KILGORE, by his attorneys, Rickner PLLC, complaining of the Defendants, alleges, upon information and belief and personal knowledge, the following:

## PRELIMINARY STATEMENT

1.      Since 1995, the County of Onondaga ("County") and its agency, the Onondaga County Sheriff's Office ("OCSO") have operated the Onondaga County Justice Center ("OCJC"). OCJC is a maximum-security correctional facility located in Syracuse, New York intended to "safely and securely house arrested, pre-trial, and Federal, State and County incarcerated individuals awaiting transfer", a mandate which it has categorically neglected for decades.[1]

2.      A 2018 report by the New York State Commission of Correction identified the OCJC as one of the most harmful corrections facilities in the state.[2] Of the seventy-four local facilities investigated, OCJC was found to "pose an ongoing risk to the health and safety of staff

---

[1] *Onondaga County Justice Center*, ONONDAGA COUNTY SHERIFF'S OFFICE (last visited June 3, 2025), https://sheriff.ongov.net/custody/justice-center/.
[2] New York State Commission of Correction, The Worst Offenders Report: The Most Problematic Local Correctional Facilities of New York State, pgs. 65-70 (Feb. 2018), available at .https://scoc.ny.gov/system/files/documents/2023/09/problematic-jails-report-2-2018.pdf.

and inmates and…impose cruel and inhumane treatment of inmates in violation of their Constitutional rights."[3] For nearly ten years prior to the report's publication, community organizers and the New York Civil Liberties Union condemned the understaffed facility's overt neglect towards those in its care.[4]

3.     OCJC's staffing crisis has been compounded by the grievous misconduct of its existing staff.  Year after year, OCSO and the County have continually dismissed reports of its staff's mismanagement and poor leadership, as well as complaints against the office alleging unconstitutional arrests, use of excessive force, asset misappropriation, negligence in furtherance of investigatory duties, racial discrimination, and retaliation, among other improprieties. On several occasions, OCSO leadership has made blatant attempts to hide or destroy evidence of its corrupt behavior, yet they have faced no consequences from the County.

4.     For the better part of three decades, the County has known that OCSO maintains dangerous, inhumane, and insufficiently staffed correctional facilities in which individuals are subjected to conditions which violate their most basic Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendment rights.

5.     Plaintiff Kyle Kilgore, an individual who was once detained at OCJC, is one of the many individuals whose rights were violated as a result of the County's ongoing egregious mismanagement, lack of discipline, and poor staffing practices.

---

[3] Samantha House, *Onondaga County Justice Center, 4 Others Named the Most Problematic Jails in NYS*, Syracuse.com (Sep. 22, 2023, 10:19 a.m), https://www.syracuse.com/crime/2018/02/onondaga_county_justice_center_named_one_of_5_most_problematic_jails_in_state.html.

[4] *Demanding Justice and Accountability at Onondaga County Jail*, New York Civil Liberties Union (Sep. 13, 2010), https://www.nyclu.org/migrated-page/central-new-york-chapter-demanding-justice-and-accountability-onondaga-county-jail#:~:text=The%20NYCLU%20has%20received%20alarming,or%20misused%20their%20power%20to.

## NATURE OF THE CASE

6.      Plaintiff KYLE KILGORE ("Plaintiff" or "Mr. Kilgore") brings this action for compensatory and punitive damages pursuant to 42 U.S.C. § 1983 for violations of his federal and state constitutional rights while in the custody of the Onondaga County Justice Center ("OCJC").

## JURISDICTION

7.      This action is brought pursuant to 42 U.S.C. § 1983 for violations of Plaintiff's rights under the Fourth and Eighth Amendment to the Constitution of the United States, Article 1 of the Constitution of the State of New York, and the common laws of the State and New York.

8.      An award of costs and attorneys' fees is authorized pursuant to 42 U.S.C. § 1988.

## VENUE

9.      Venue is properly laid in the United States District Court for the Northern District of New York because the Plaintiff's claims arose in the County of Onondaga, which is within the jurisdictional limits of the Northern District.

## JURY DEMAND

10.     Plaintiff hereby demands a trial by jury.

## PARTIES

11.     Plaintiff was at all times relevant to this action a resident of Onondaga County.

12.     Defendant County of Onondaga ("County") is a municipal entity created and authorized under the laws of the State of New York. It is authorized by law to maintain a police department that acts as its agent in the area of law enforcement, for which it is ultimately responsible.

13.     Defendant Onondaga County Sherriff's Office ("OCSO") is a sub-agency of Defendant County, which maintains and controls the Onondaga County Justice Center ("OCJC"),

the detention facility in which Plaintiff was assaulted.

14.     Defendant County assumes the risks incidental to the maintenance of a police force and the employment of police officers as said risks attach to the public consumers of the services provided by police.

15.     Defendant Sergeant Dustin Saddock, ID# 2938 (hereinafter "Saddock") was at all relevant times described herein an OCSO officer working at OCJC and employed by Defendant County. At all relevant times described herein, he was acting under color of New York State Law and acting in the course and scope of his duties. He is sued in his individual capacity. Under New York law, Sergeant Saddock is entitled to indemnification by the County for any liability arising from his conduct described herein. Sergeant Saddock is also entitled to indemnification by the County, pursuant to contract, for any liability arising from his conduct described herein.

16.     Defendant Deputy Thomas Fodaro III, ID# 4051 (hereinafter "Fodaro") was at all relevant times described herein an OCSO officer working at OCJC and employed by Defendant County. At all relevant times described herein, he was acting under color of New York State Law and acting in the course and scope of his duties. He is sued in his individual capacity. Under New York law, Deputy Fodaro is entitled to indemnification by the County for any liability arising from his conduct described herein. Deputy Fodaro is also entitled to indemnification by the County, pursuant to contract, for any liability arising from his conduct described herein.

17.     Defendant Deputy Ethan Perry, ID# 2987 (hereinafter "Perry") was at all relevant times described herein an OCSO officer working at OCJC and employed by Defendant County. At all relevant times described herein, he was acting under color of New York State Law and acting in the course and scope of his duties. He is sued in his individual capacity. Under New York law, Deputy Perry is entitled to indemnification by the County for any liability arising from his conduct

described herein. Deputy Perry is also entitled to indemnification by the County, pursuant to contract, for any liability arising from his conduct described herein.

18.    Defendant Deputy Erik Francis, ID# 2976 (hereinafter "Francis") was at all relevant times described herein an OCSO officer working at OCJC and employed by Defendant County. At all relevant times described herein, he was acting under color of New York State Law and acting in the course and scope of his duties. He is sued in his individual capacity. Under New York law, Deputy Francis is entitled to indemnification by the County for any liability arising from his conduct described herein. Deputy Francis is also entitled to indemnification by the County, pursuant to contract, for any liability arising from his conduct described herein.

19.    Defendant Deputy James Schmunk, ID# 4205 (hereinafter "Schmunk") was at all relevant times described herein an OCSO officer working at OCJC and employed by Defendant County. At all relevant times described herein, he was acting under color of New York State Law and acting in the course and scope of his duties. He is sued in his individual capacity. Under New York law, Deputy Schmunk is entitled to indemnification by the County for any liability arising from his conduct described herein. Deputy Schmunk is also entitled to indemnification by the County, pursuant to contract, for any liability arising from his conduct described herein.

20.    Collectively, Defendants Saddock, Fodaro, Perry, Francis, and Schmunk are referred to as the "Individual Defendants."

21.    At all times relevant herein, the Individual Defendants were acting under color of state law in the course and scope of their duties and functions as agents, servants, employees, and officers of the County and/or OCSO, and otherwise performed and engaged in conduct incidental to the performance of their lawful functions in the course of their duties. They were acting for and on behalf of the County and/or OCSO at all times relevant herein, with the power and authority

vested in them as officers, agents and employees of the County and/or OCSO, and incidental to the lawful pursuit of their duties as officers, employees and agents of the County and/or OCSO.

22.     At all relevant times, the Individual Defendants were engaged in a joint venture, assisting each other in performing the various actions described herein and lending their physical presence and support and the authority of their offices to one another.

## THE VIOLATION OF PLAINTIFF'S CIVIL RIGHTS

23.     On July 27, 2024, Plaintiff was being held in Pod 5C, the mental health unit, when Defendant Saddock and two unknown officers came to escort him to bookings.

24.     In bookings, Plaintiff was placed in holding cell #2 for approximately thirty minutes before the Individual Defendants came to his cell and told him to turn around and put his hands behind his back.

25.     The Individual Defendants opened his cell, handcuffed him in the rear, and escorted him to the Behavioral Stabilization Room ("BSR") for a strip search.

26.     One of the Individual Defendants asked him to take his clothing off. When Plaintiff stated that he could not, because he was handcuffed, he was immediately slammed face first onto the ground.

27.     Defendant Saddock held his head in between both hands and pushed his head further into the ground. The other Individual Defendants all pushed Plaintiff's body into the ground.

28.     After this, Defendant Francis repeatedly punched Plaintiff in his right side.

29.     Then, Defendant Schmunk got ahold of Plaintiff's legs, crossed them, and kneeled onto his legs in order to restrain him.

30.     At no point during this entire encounter does Plaintiff fail to comply or struggle against the Individual Defendants.

31.     Once the Individual Defendants cut off all of Plaintiff's clothes, they left him naked in the BSR.

32.     Approximately 15-20 minutes after Plaintiff's assault, a nurse named Igor came to examine him. Plaintiff told him he had pain in the left side of his face and his nose and that he could not see anything out of his left eye/that his vision was blurry, but the nurse simply walked off and did nothing to treat his injuries.

33.     Approximately 3-4 hours later, Plaintiff was brought a new set of clothing.

34.     Twenty-four hours later, Plaintiff was escorted from the BSR back to Pod 5C.

35.     For the next three days, Plaintiff asked every officer and nurse he saw for medical attention, but his requests were ignored.

36.     It was not until July 30, 2024, in the afternoon, that he was finally taken to Upstate University Hospital, where he was diagnosed with a significant left eye subconjunctival hemorrhage and other injuries.

37.     Since the incident, Plaintiff saw eye doctors at OCJC–to date, Plaintiff still suffers from floaters in his left eye.

38.     Also, while at OCJC, multiple unknown officers repeatedly harassed Plaintiff and used slurs against him about his underlying crime to instigate other incarcerated individuals into assaulting him.

**THE INJURIES TO PLAINTIFF**

39.     This action seeks damages on behalf of Plaintiff for the extraordinary emotional pain and suffering and injuries to his person, that he was forced to endure as a consequence of the Individual Defendants' decidedly wrongful actions.

40.     The Individual Defendants' actions were wanton, reckless, and malicious, as well as in blatant disregard of Plaintiff's civil rights, and as such they are liable for punitive damages.

41.     All of the causes of action pleaded herein fall within one or more of the exceptions set forth in New York's Civil Practice Law & Rules 1602 with respect to joint and several liability.

**FIRST CLAIM FOR RELIEF:**
**EXCESSIVE FORCE UNDER 42 U.S.C. § 1983**
**AGAINST THE INDIVIDUAL DEFENDANTS**

42.     Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

43.     The Individual Defendants used unnecessary and excessive physical force on Plaintiff.

44.     Even if initial force was necessary to restrain Plaintiff, the use of further, excessive, or gratuitous force was violative of Plaintiff's federal constitutional rights.

45.     That by virtue of the aforementioned acts by the Individual Defendants, Plaintiff was deprived civil rights guaranteed under the United States Constitution, and the Individual Defendants therefore are liable to Plaintiff for damages under 42 U.S.C. § 1983.

46.     As a result of the above unconstitutional conduct, Plaintiff was caused to suffer physical and emotional injuries, as well as increased restrictions on his liberty.

47.     As a result of the above unconstitutional conduct, the Individual Defendants are liable for punitive damages.

**SECOND CLAIM FOR RELIEF:**
**ILLEGAL SEARCH UNDER 42 U.S.C. § 1983**
**AGAINST THE INDIVIDUAL DEFENDANTS**

48.    Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

49.    The Individual Defendants searched Plaintiff without probable cause to do so. Even if there was probable cause, the manner in which the search was conducted was unreasonable.

50.    That by virtue of the aforementioned acts by the Individual Defendants, Plaintiff was deprived of his civil rights guaranteed under the United States Constitution to be free from unreasonable or unlawful searches and seizures, and the Individual Defendants therefore are liable to Plaintiff for damages under 42 U.S.C. § 1983.

51.    As a result of the above unconstitutional conduct, Plaintiff was caused to suffer physical and emotional injuries, as well as increased restrictions on his liberty.

52.    As a result of the above unconstitutional conduct, the Individual Defendants are liable for punitive damages.

**THIRD CLAIM FOR RELIEF:**
**FAILURE TO INTERVENE UNDER 42 U.S.C. § 1983**
**AGAINST THE INDIVIDUAL DEFENDANTS**

53.    Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

54.    The Individual Defendants failed to intervene to prevent, end or report the unlawful and unconstitutional conduct to which Plaintiff was subjected despite the fact that they had opportunities to do so.

55.    The Individual Defendants thereby displayed deliberate indifference to Plaintiff's rights, including Plaintiffs right to be free from excessive force and unreasonable searches and seizures.

56.    That by virtue of the aforementioned acts by the Individual Defendants, Plaintiff was deprived of civil rights guaranteed under the Constitution of the United States, and the Individual Defendants therefore are liable to Plaintiff for damages under 42 USC § 1983.

57.    As a result of the above unconstitutional conduct, Plaintiff was caused to suffer physical and emotional injuries, as well as increased restrictions on his liberty.

**FOURTH CLAIM FOR RELIEF:**
***MONELL* CLAIMS AGAINST THE COUNTY OF ONONDAGA**

58.    Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

59.    The County of Onondaga is liable under *Monell v. Department of Soc. Svcs.*, 436 U.S. 658 (1978) for the misconduct of OSCO officers generally, as well as that of the Individual Defendants.

60.    At all times relevant to this Complaint, Defendant County has had in effect *de facto* and explicit policies, procedures, and practices that were a direct and proximate cause of the constitutional violations described herein. The constitutional abuses, including the manner in which the Defendant County has failed to properly train and supervise OCSO staff, including the Individual Defendants, demonstrates a deliberate indifference to the rights, safety, and well-being of every individual detained at OCJC, including Plaintiff Kilgore.

61.    The abovementioned actions were persistent and recurring to the extent that the actions were, and/or became, a recurring practice, policy, and/or procedure of Defendant County.

62.     In addition, the direct, foreseeable, proximal, and inevitable result of the County's policies are the numerous foregoing deprivations of Plaintiff's constitutional rights. The injuries Plaintiff sustained were caused by the conduct of OCSO officers, including Defendants Saddock and Fodaro, both of whom have demonstrated histories of excessive force and violent misconduct. These constitutional violations are chargeable to the Defendant County, as the misconduct of OCSO staff is so widespread and pervasive as to constitute *de facto* policies that the County has accepted, encouraged, ratified, and enforced by doing nothing to stop them.

### a.  The County has failed to address serious understaffing issues

63.     The County of Onondaga has *de facto* policies of understaffing OCJC and failing to hire, train, and properly manage qualified deputies and staff members. These failures have directly led to staff frustration and an increase in the use of violence as a means to control the incarcerated population. The County, including the final policy makers at OCSO and the County Executive himself, have been aware of problems like those outlined in this Complaint, yet have chosen to do nothing to slow or stop it.

64.     This is not a case where a single incident caused a civil rights violation, although often that is the case. Instead, there are a collection of horrible conditions that have worked in concert to make OCJC unbearable, unconstitutional, and inhumane. These conditions, moreover, have not occurred at isolated times; the problem is system wide.

65.     Since at least December 2021, the County has been aware that OCJC is grossly understaffed—Onondaga County Executive Ryan McMahon and then-Sheriff Eugene Conway announced a proposal to merge Jamesville Correctional Facility and OCJC, the two facilities run by the Sheriff's Office, due, at least in part, to staffing shortages, as well as the County's failure

to get incarcerated individuals to court appearances.[5] This proposal however, has yet to come to fruition.

66.    In 2021, OCJC was so understaffed that the deputies working there were among the highest government earners in the County, with over $7.7 million in overtime payments.[6]

67.    In October 2022, it was reported that the current staff would not be able to keep OCJC functioning without overtime.[7] At that time, there were 79 vacancies in custody and corrections.[8] In addition, the number of individuals taking the civil service exam that would allow them to work in custody and corrections has been on a steady decline—according to the Onondaga County Executive's Office, in 2018, 303 people took the exam and 212 passed. In 2022, only 51 people took the exam and only 33 passed.[9]

68.    In 2023, the story was the same—Sheriff Tobias Shelley, head of OCSO, stated, "[w]ithout giving anybody the day off, without having any sick people, without having any injured people, it's six people down. And that's just the start of a shift. This place runs on overtime. We don't have sufficient people to run it."[10]

69.    However, Sheriff Shelley has done nothing to resolve the situation, even though it is obvious that deputies who work extreme hours are working at a severely diminished capacity,

---

[5] Chris Libonati, '*I'm just thankful': Sheriff Eugene Conway to retire after nearly 45 years*, SYRYRACUSE.COM (Jan. 7, 2022, 5:45 p.m.), https://www.syracuse.com/crime/2022/01/im-just-thankful-sheriff-eugene-conway-to-retire-after-nearly-45-years.html; Conor Wight, *Onondaga Co. Legislature votes to merge jails; Sheriff Toby Shelley says not yet*, CNYCENTRAL (Feb. 7, 2023 at 6:20 p.m.), https://cnycentral.com/news/local/onondaga-co-legislature-votes-to-merge-jails-sheriff-toby-shelley-says-not-yet#.
[6] Conor Wight, *The $194k deputy; Onondaga Co. Sheriff's office spend $7.7 million in overtime to run jail*, CNYCENTRAL (Oct. 24, 2022 at 2:50 p.m.), https://cnycentral.com/news/i-team/the-194k-deputy-onondaga-co-sheriffs-office-spend-77-million-in-overtime-to-run-jail.
[7] *Id.*
[8] *Id*.
[9] *Id.*
[10] Mary Kielar, *I-Team: Overtime for protecting those doing time at the Onondaga County Jail*, CNYCENTRAL (Sept. 10, 2023 at 10:31 p.m.), https://cnycentral.com/news/i-team/i-team-overtime-protecting-those-doing-time-at-the-onondaga-county-jail.

are more likely to inflict violence, and are less likely to perform necessary aspects of their jobs. In fact, Sheriff Shelley has made conditions worse—on February 7, 2023, when the Onondaga County legislature voted 9-8 in favor of closing Jamesville Correctional Facility and merging it with OCJC, a move that would create more jobs at OCJC and help address staffing concerns, Sheriff Shelley filed a lawsuit against the County for "infringing on the power of the sheriff."[11]

70.    When his lawsuit was dismissed by a Supreme Court Judge in April 2024, he appealed to the Appellate Division for the Fourth Judicial Department, who, in April 2025 upheld the Judge's decision.[12] Rather than actively improve the conditions at OCJC, the very Sheriff responsible for its maintenance has actively fought against a move that would largely address the staffing shortage.

71.    To date, all discussions by the County to address staffing shortages have come to a standstill. These repeated failures to address and remedy the perennial staffing shortages are demonstrative of Defendant County's practice of deliberate indifference to the constitutional rights and basic dignity of its incarcerated population.

72.    As a result of the foregoing policies, practices, and/or customs, the Defendant County has effectively ensured that every individual incarcerated at OCJC will experience a deprivation of constitutional rights, whether it be through lack of adequate services or violence at the hands of overworked deputies.

---

[11] Allura Leggard, *Onondaga County Sheriff sues county and legislature over approved jail merger*, CNYCENTRAL (June 8, 2023 at 6:51 p.m.), https://cnycentral.com/news/local/onondaga-county-sheriff-sues-county-and-legislature-over-potential-jail-merger#.
[12] Greta Stuckey, *Appeals court: N.Y. sheriff cannot block closure of correctional facility*, CORRECTIONS1.COM (April 29, 2025 at 3:32 p.m.), https://www.corrections1.com/jail-management/appeals-court-n-y-sheriff-cannot-block-closure-of-correctional-facility.

**b.  <u>Lack of discipline and consequences for Sheriff and deputies</u>**

73.  Understaffing is just a part of the longstanding practices of mismanagement, poor leadership, and lack of accountability for misconduct at the very top levels of OSCO management.

74.  An audit conducted by the Onondaga County Comptroller's Office in January 2019 concluded that OCSO "did not perform due diligence in maintaining their grants," and made a series of recommendations regarding the management of funds.[13] The Sheriff's Office did seemingly nothing to implement these recommendations, as OCSO grant writer and Civil Deputy Isaac Eames was able to steal nearly $529,000 from the Sheriff's Office between 2020 and July 2021.[14] Deputy Eames made approximately thirteen successful transfers of funds to his bank account, yet it took until December 2021 for OSCO to even notice the transfers and begin questioning Deputy Eames.[15]

75.  As a likely result of the public embarrassment surrounding Deputy Eames, when Sheriff Shelley took office in January 2023, he requested that the Onondaga County Comptroller's Office review the operations of OCSO as related to their oversight of multiple bank accounts.[16]

76.  Four audits took place in January, May, September, and November 2024, for the time period of January 1, 2022 through July 31, 2023, and covering OSCO's civil bank account, the criminal court and family court bail accounts, the Justice Center commissary and inmate

---

[13] *Onondaga County Sheriff requests audit of deputy who killed son and shot wife*, LOCALSYR.COM (updated Feb. 15, 2022 at 11:35 a.m.), https://www.localsyr.com/news/local-news/onondaga-co-sheriff-requests-audit-of-deputy-who-killed-son-and-shot-wife/.
[14] Samantha Croston, *Karen Eames pleads 'not guilty' to stealing $500K with husband*, CNYCENTRAL (May 27, 2022 at 8:00 a.m.), https://cnycentral.com/news/local/karen-eames-pleads-not-guilty-to-stealing-500k-with-husband?photo=2.
[15] *Id.*
[16] Onondaga County Comptroller Martin D. Masterpole, <u>Audit Report on the Onondaga County Sheriff's Office Jail & Bail Trust & Agency Account</u> (May 2024), *available at* http://www.ongov.net/comptroller/documents/PoundageandUnclaimedFundsFINALReportwithMGMTResponse.pdf.

revenue accounts, and unclaimed funds and poundage procedures.[17] All of these reports showed repeated problems, including but not limited to: failures to make transactions and deposits in accordance with written Sheriff's directives, inadequate and/or improperly completely bank reconciliation processes, noncompliance with several New York State laws and practices regarding finances and accounting, noncompliance with previously indicated corrective actions, and lack of documentation regarding unclaimed funds.[18]

77.    To date, no one in the Sheriff's Office has faced consequences for the mismanagement of funds, nor have obvious steps been taken to implement practice and policy changes to ensure that OCSO accounts are in compliance with the law.

78.    These failures to implement policy changes or even penalize the officers responsible sets a precedent that officers, like the Individual Defendants, can do whatever they want without facing consequences.

79.    Mismanagement of funds is just one aspect of OCSO's poor leadership and lack of accountability—in October 2018, retired Sergeant Kevin Murphy filed a 70-page complaint against OCSO in the Northern District of New York, alleging "improper and illegal polices", "inadequate and illegal police performance, supervision, [and] training," "gross negligence in the

---

[17] *Id.*; Onondaga County Comptroller Martin D. Masterpole, <u>Audit Report on the Onondaga County Sheriff's Office Criminal Court Bail & Family Court Bail Accounts, Poundage & Unclaimed Funds</u> (Jan. 23, 2024), *available at*
http://www.ongov.net/comptroller/documents/PoundageandUnclaimedFundsFINALReportwithMGMTResponse.pdf; Onondaga County Comptroller Martin D. Masterpole, <u>Audit Report on the Onondaga County Sheriff's Office Civil Bank Account</u> (Sept. 25, 2024), *available at*
http://www.ongov.net/comptroller/documents/AuditReportonOnondagaCountySheriffsOfficeCivilBankAccount.pdf; Onondaga County Comptroller Martin D. Masterpole, <u>Audit Report on the Onondaga County Sheriff's Office Justice Center Commissary & Inmate Revenue Accounts</u> (Nov. 27, 2024), *available at*
http://www.ongov.net/comptroller/documents/JCCommandIRAFinalReportWithMGMTResponse.pdf.
[18] *Id.*

performance of police investigatory duties, improper and unconstitutional arrests, illegal seizures performed without a warrant, […] false recordkeeping, [… and] racially inappropriate behavior."[19]

80.     In his complaint, Sergeant Murphy outlined, in detail, specific instances where he told supervisors about his concerns, and in response, those in charge did nothing to address what, in some circumstances, was grossly negligent and illegal police activity.[20] Rather than being heralded for his bravery and drive to effect positive change in the Sheriff's Office, Sergeant Murphy argues he was retaliated against by other deputies and denied promotions because he dared to report these alleged wrongdoings.[21]

81.     It should come as no surprise that the Sheriff's Office not only continued to ignore reported incidents of misconduct but actively destroyed evidence of it. When Sheriff Shelley took office in 2023, he reported that not only did his predecessor, Eugene Conway, fail to aid in the transition of power, he also used "tax dollars" to pay for a shredder truck to be parked outside Sheriff's headquarters for five days.[22] Sheriff Shelley admitted that the Conway administration "shredded everything they could. Computers were deleted, policies were delated, operational plans […] were deleted […]."[23]

82.     Despite this blatant attempt to destroy what was likely incriminating evidence, County Attorney District Attorney William Fitzpatrick publicly stated that the "investigation" into Sheriff Shelley's accusations yielded no "evidence that what [Conway] did was criminal."[24]

---

[19] *Kevin Murphy v. Onondaga County et al.*, 18-cv-1218-GLS-ATB (N.D.N.Y. Oct. 11, 2018).
[20] *Id.*
[21] *Id.*
[22] Michael Benny, *Onondaga Co. Sheriff blasts previous administration with allegations of shredding*, CNYCENTRAL (updated Oct. 4, 2023 at 10:38 a.m.), https://cnycentral.com/news/local/onondaga-co-sheriff-blasts-previous-administration-with-allegations-of-shredding#.
[23] *Id.*
[24] Conor Wight, *Looking into the Onondaga County Sheriff's new claims about rocky transition period*, CNYCENTRAL (updated Oct. 5, 2023 at 10:47 a.m.), https://cnycentral.com/newsletter-daily/looking-into-the-onondaga-county-sheriffs-new-claims-about-rocky-transition-period.

83.    In fact, the County appears to reward misconduct, as in 2024, Sheriff Shelley promoted Nate Hawker to Chief Custody Deputy, despite the fact that he "falsified weapon inspection and maintenance worksheets" multiple times under former Sheriff Conway.[25] Deputy Hawker is now responsible for the maintenance and supervision of the entire Justice Department.[26]

84.    These consistent failures to appropriately train and discipline competent and law-abiding staff are demonstrative of the Defendant County's practice of deliberate indifference to the constitutional rights and basic dignity of its incarcerated population. As a result of the foregoing policies, practices, and/or customs, the Defendant County has effectively ratified and allowed for the employment and retention of individuals who endanger the livelihoods and safety of those entrusted into their care and custody. Such policies, practices, and/or customs are a direct and proximate cause of the conduct alleged herein and a direct and proximate cause of Plaintiff's injuries.

**c.    The County has allowed deplorable conditions to exist within OCJC**

85.    Mismanagement, lack of proper staffing, and lack of accountability have also caused conditions at the Justice Center, which is run by OCSO, to deteriorate to the point where conditions of confinement are so inhumane that they continuously violate the constitutional rights of detainees housed there.

86.    For example, Cheree Byrd, who was detained at OCJC while pregnant, was ignored by deputies when she went into premature labor on August 2, 2022.[27] For two days, she was in

---

[25] *Id*.

[26] Rylee Kirk, *New head of Justice Center once falsified weapons maintenance record*, SYRACUSE.COM (updated Aug. 30, 2024 at 2:20 p.m.), https://www.syracuse.com/crime/2024/08/new-head-of-justice-center-once-lied-on-weapons-maintenance-record.html.

[27] *Cheree Byrd v. Onondaga County Sheriff Eugene Conway et al.*, Index No. 010200/2023 (Onondaga Cnty. Supreme Ct. 2023).

pain, begging and pleading for help—at some point, she began bleeding and was brought tampons, which she used to smear blood on her window in an attempt to get the deputies' attention.[28] Despite her obvious pain and visible blood, Ms. Byrd was left in her cell for over twenty (20) hours in labor before giving birth to her daughter on her own.[29] When she was taken with her baby to Crouse Hospital fifteen minutes later, her baby was pronounced dead.[30]

87.    Angela Peng was also detained at the Justice Center and had a history of substance abuse and suicide attempts.[31] Despite this, she was not given adequate mental health or detox screenings when she arrived at OCJC on September 1, 2021.[32] The following day, she was found lethargic and nonverbal, lying on her cell floor covered in vomit and feces.[33] She was eventually taken to Upstate University Hospital for treatment, at which time deputies searched her cell and found medication used to treat opioid dependance/addiction.[34] Rather than provide treatment, upon her return from the hospital on September 3, 2021, she was written up for contraband.[35] Ms. Peng was not monitored and later that same day, she hung herself in her cell using a bed sheet.[36]

88.    In September 2016, the New York Civil Liberties Union and Legal Services of Central New York filed a class action on behalf of eighty teens who were held in solitary confinement at OCJC between October 2015 and August 2016.[37] The teens, most of them of

---

[28] *Id.*

[29] *Id.*

[30] *Id.*

[31] *Lori Reynolds, Individually and as Administratrix of the Estate of Angela P. Peng* v. *The County of Onondaga et al.*, 22-cv-01165-BKS-TWD (N.D.N.Y Nov. 8, 2022).

[32] *Id.*

[33] *Id.*

[34] *Id.*

[35] *Id.*

[36] Tim Knauss, *Onondaga County and medical provider to pay $750K to family of inmate who died by suicide*, SYRACUSE.COM (Sept. 30, 2024 at 7:30 p.m.), https://www.syracuse.com/news/2024/09/onondaga-county-and-its-former-medical-provider-settle-suit-over-justice-center-inmates-suicide.html.

[37] Patrick Lohmann, *Onondaga County jail faces class-action suit over teen solitary confinement*, SYRACUSE.COM (Sept. 21, 2016 at 7:06 p.m.),

minority races, were held in shocking and dehumanizing solitary confinement conditions, forced to spend 23 hours a day locked in barren seven by nine foot cells where, in some instances, there was visible feces and urine on the floor.[38] The teens were also sexual harassed by adults and deputies, denied education, and in some cases, became suicidal.[39]

89.　　In the words of Samuel Young, director of advocacy for Legal Services of Central New York, "[e]ven the infamous Rikers Island has recognized that solitary confinement of juveniles must stop. One of the only places in the country where a 16 or 17-year-old child can find themselves in a solitary confinement cell […] is in our very own Onondaga County Justice Center."[40] In June 2017, the parties reached a settlement under which the county agreed not to use solitary confinement for juveniles except in extraordinary circumstances.[41] However, the Justice Center continued to violate state and federal rules against excessive confinement during Covid-19, only allowing incarcerated individuals out of their cells for thirty minutes a day.[42]

90.　　Persons in custody have also continued to die in the Justice Center. For example, in September 2023, Giles Gerhart was found unresponsive in his cell after having told staff he was "addicted to heroin and fentanyl."[43]

---

https://www.syracuse.com/crime/2016/09/onondaga_county_jail_faces_class-action_suit_over_teen_solitary_confinement.html.
[38] New York Civil Liberties Union, Lawsuit: Syracuse Jail is Harming Children with Abusive Solitary Confinement Conditions (Sept. 20, 2016), *available at* https://www.nyclu.org/press-release/lawsuit-syracuse-jail-harming-children-abusive-solitary-confinement-conditions.
[39] *Id.*
[40] *Id.*
[41] Tim Knauss, *Settled lawsuit over teen solitary confinement to cost Onondaga County $270,000*, SYRACUSE.COM (Apr. 30, 2018 at 2:53 p.m.), https://www.syracuse.com/news/2018/04/settled_lawsuit_over_teen_solitary_confinement_to_cost_onondaga_county_270000.html.
[42] Tim Knauss, *NYCLU urges Onondaga County jail to relax 'harmful' lockdown in response to Covid*, SYRACUSE.COM (Dec. 24, 2020 at 4:10 p.m.), https://www.syracuse.com/coronavirus/2020/12/nyclu-urges-onondaga-county-jail-to-relax-harmful-lockdown-in-response-to-covid.html.
[43] Kevin Revier, *In New York, Inadequate Treatment Is Turning Drug Arrests Into Death Sentences*, TRUTHOUT (Dec. 4, 2023), https://truthout.org/articles/in-new-york-inadequate-treatment-is-turning-drug-arrests-into-death-sentences/.

91.    In March 2023, Dustin Montanez was found unconscious in his cell—his death was ruled a suicide by the New York State Attorney General's Office.[44]

92.    In April 2023, Patrick Miller was found unresponsive in his cell after overdosing on drugs.[45] After an investigation, the Commission of Correction investigation concluded that the Sheriff "shall conduct an inquiry into the conduct of the deputies who were responsible for Miller's supervision *in view of the fact that supervisory tours prior to Miller's discovery were not conducted per minimum standard requirements*. Administrative action should be taken if found to be in violation of facility policy and procedures."[46] The Justice Center seemingly did absolutely nothing to address this.

93.    In February 2024, when Timothy Green reported experienced a "medical episode" before being taken to Upstate Hospital, where he was pronounced dead.[47] It again appears that nothing happened from an internal investigation into the incident.

94.    These repeated failures to implement any meaningful policy changes to improve the conditions of OCJC guarantee that every individual incarcerated at the Justice Center will face a constitutional violation, whether it be living in deplorable and disgusting conditions, being verbally and/or physically abused by staff, being ignored when in need of medical care, or being forced into solitary confinement. In some cases, the County's failures even result in death.

95.    As a result of the foregoing policies, practices, and/or customs, the Defendant County has effectively deprived Plaintiff of his constitutional rights. The driving force behind the

---

[44] *Id.*
[45] New York State Commission of Correction, <u>In the Matter of the Death of Patrick Miller, an incarcerated individual at the Onondaga County Justice Center</u> (June 25, 2024), available at https://scoc.ny.gov/system/files/documents/2024/08/miller-patrick-onondaga-jc.pdf
[46] *Id.* (emphasis added).
[47] Emma Misiaszek, *Onondaga Co. Justice Center inmate dies after medical episode, investigation underway*, CNYCENTRAL (Feb. 8, 2024 at 5:44 p.m.), https://cnycentral.com/news/local/onondaga-co-justice-center-inmate-dies-after-medical-episode-investigation-underway.

abysmal conditions of confinement in the County's facilities is a combination of its failure to properly staff its jails, train the individuals working there, and failure to keep the facilities in proper working order. Such policies, practices, and/or customs are a direct and proximate cause of both the conduct alleged herein as well as Plaintiff's injuries.

> **d.  The County has been on notice of the pervasive culture of violence among its OCSO staff yet has done nothing to address it**

96.    For nearly a decade, the County has been aware, or had ample opportunity to become aware, of the unsafe conditions in its facilities and the shortcomings of its staff and employees.

97.    In 2015, the Onondaga County Legislature successfully passed a law which resulted in the creation of the Justice Center Oversight Committee.[48] The Committee receives complaints from or on behalf of individuals in custody and is authorized to draft and provide recommendations regarding policy, procedures, and training to the Sheriff, County Executive, and legislators.[49] While the Committee may submit recommendations and investigate complaints, OCSO and the County retain the power to implement and enforce any recommendations made.

98.    The subsequent 2018 report by the Commission of Corrections identified overcrowding and understaffing as the two most pressing concerns at OCJC.[50] The report further described numerous instances in which litigation commenced against OCJC for unconstitutional practices and policies dating back to 2012 at the earliest.[51]

99.    These reports, independent investigations, and previous/ongoing litigation have

---

[48] *Justice Center Oversight Committee*, ONONDAGA COUNTY (last visited June 3, 2025), https://onondaga.gov/jcoc/.
[49] *Id.*
[50] *Supra* n.2.
[51] *Id.*

sufficiently placed Defendant County on notice as to the nature, causes, and persistence of the abuses committed by OCSO staff and inside OCJC. The County's continual failure to ameliorate this misconduct indicates a pattern and practice of deliberate indifference towards the welfare and safety of the individuals in custody.

100.   The inevitable combination of mismanagement, lack of discipline, and understaffing has increased the violence used by Sheriff's Office deputies. While the number of use-of-force incidents in 2021 was 59, one of which resulted in death, the total number of incidents more than tripled in 2022 to 192 and in 2023, the total use of force incidents was 155.[52]

101.   Even before the current staffing shortage, however, the Sheriff's Office has allowed its deputies to commit acts of violence with little to no consequences. For example, on the morning of August 9, 2018, while Sean Wicks was being booked and processed at the Justice Center, Deputy Jayuan Willis grabbed Mr. Wicks by the left arm and twisted it.[53] The Deputy twisted his arm so hard that Mr. Willis suffered a severe spiral facture of his left humerus, which, *inter alia*, resulted in a permanent loss of range of motion and numbness as a result of the fracture.[54] In a civil rights lawsuit brought by the Estate of Sean Wicks, the jury found in favor of Mr. Wicks.[55]

102.   This was not the first time Deputy Willis used violence against an individual in custody—in October 2012, Ronald Lee was slammed into the floor of the Justice Center by Deputy Willis and Sergeant Kevin Murphy.[56] Deputy Willis not only faced zero consequences for these

---

[52] Division of Criminal Justice Services, Use of Force Data Tables November 2020 – December 2023, *available at* https://www.criminaljustice.ny.gov/crimnet/ojsa/stats.htm.
[53] *Garry Wicks, as Administrator of the Estate of Sean Wicks v. the County of Onondaga et al.*, Index No. 007029/2019 (Onondaga Cnty. Supreme Ct. 2019).
[54] *Id.*
[55] *Id.*
[56] Alex Dunbar, *Jury rules that two Onondaga Co. custody deputies did not use excessive force*, CNYCENTRAL (Nov. 3, 2016 at 6:24 p.m.), https://cnycentral.com/news/local/testimony-wraps-up-in-excessive-force-lawsuit-against-two-onondaga-co-custody-deputies.

incidents, but in 2024, he was the 23rd highest paid employee of Onondaga County.[57]

103.    In 2022, Justin Wright brought a lawsuit against OCSO for an incident on October 10, 2021.[58] On that date, at approximately 8:00 p.m., Mr. Wright was sitting in his car, in his girlfriend's driveway, with his two minor children, when he observed flashlights pointed at his vehicle.[59] After asking several times who was there, the deputies identified themselves and told him to get out of the vehicle.[60] Mr. Wright, rightly scared, told them he would not get out of this vehicle until the deputies informed him what the purpose of their inquiry was.[61] They continued to tell him to get out, and as he eventually started to get out of the car, he was grabbed, thrown to the ground, beaten, and handcuffed.[62] In late February 2025, a jury rendered a verdict in Mr. Wright's favor.[63]

104.    In March 2024, Nyquest Allen brought a lawsuit against OCSO after being beaten in his cell at OCJC after asking the deputies to loosen his handcuffs.[64] Mr. Allen has permanent loss of hearing in his left ear due to the assault.[65] There are no cameras in the cells at the Justice Center, so there was no direct evidence of his assault.

105.    In 2023, it was disclosed to the public that former Sheriff Conway worked against OCSO's ability to have more incidents captured on video—he had returned technology that would automatically activate a body camera when a deputy draws a gun or taser.[66] This policy became a

---

[57] Kevin Tampone, *See top-earning Onondaga County employees ranked; search 2024 pay for over 5,000 workers*, SYRACUSE.COM (Jan. 21, 2025 at 8:00 a.m.), https://www.syracuse.com/data/2025/01/see-top-earning-onondaga-county-employees-ranked-search-2024-pay-for-over-5000-workers.html.
[58] *Justin L Wright v. County of Onondaga et al.*, Index No. 006123/2022, (Onondaga Cnty. Supreme Ct. 2023).
[59] *Id.*
[60] *Id.*
[61] *Id.*
[62] *Id.*
[63] *Id.*
[64] *Nyquest Allen v. County of Onondaga et al.*, 24-cv-332-LEK-TWD (N.D.N.Y. March 8, 2024).
[65] *Id.*
[66] *Supra* note 24.

focal point when, in September 2023, a deputy shot and killed two teenagers—15 years old Dhal

Apet and 17-year-old Lueth Mo—after turning off his dash camera and without activating his body

warn camera.[67] On March 21, 2025, the state Attorney General's Office announced it would not

charge the deputy.[68] However, they did recommend that "OCSO, and all police agencies, should

equip officers with BWCs and cars with dashboard cameras, and implement polices and training

to ensure effective use."[69] To date, there is no evidence that training has taken place or been

scheduled for the future, and the deputy who killed the teens is back at work.

106.    In January 2025, OCSO deputies handcuffed an eleven-year-old child, driving her

to tears, continually highlighting OCSO's complete failure to implement body warn camera

requirements or to train officers on proper procedures; the only reason the public became aware of

this incident is because the young girl's cousin videotaped the incident— no body warn cameras

were activated.[70] In response to this incident, Sheriff Shelley stated that is "exactly how they

handle children" due to what he described as "rampant juvenile crime."[71]

107.    Finally, the Attorney General Office of Special Investigation is currently

investigating the death of Miles Digenean, who died on March 21, 2025, after being shot to death

by members of the Sheriff's Office.[72]

---

[67] *Id.*

[68] Rylee Kirk, *AG won't charge Onondaga County deputy who shot and killed two teens in stolen car*, SYRACUSE.COM (March 21, 2025, 3:31 p.m.), https://www.syracuse.com/crime/2025/03/ag-wont-charge-onondaga-county-deputy-who-shot-and-killed-two-teens-in-stolen-car.html.

[69] Office of Special Investigation, the New York State Attorney General, <u>Report on the Investigation into the Deaths of Dhal Apet and Lueth Mo</u> (March 21, 2025), available at https://ag.ny.gov/sites/default/files/reports/osi-apet-and-mo-report.pdf.

[70] Conor Wight, *Onondaga County Sheriff defends deputies who handcuffed girl*, CNYCENTRAL (Jan. 15, 2025 at 5:55 p.m.), https://cnycentral.com/news/local/toby-01-15-2025.

[71] *Id.*

[72] New York State Office General, <u>Investigation into the Death of Miles Dignean</u> (accessed May 5, 2025) available at https://ag.ny.gov/osi/footage/miles-dignean.

108. The foregoing incidents, history of litigation, and significant press coverage have placed the Defendant County on notice of its employees' violent behavior and that its failure to appropriately hire, train, supervise, and discipline its staff creates a legitimate and substantial risk of harm and/or death. Furthermore, the foregoing examples together demonstrate a repeated pattern and practice of condoning abuse that has been permitted and, in some cases, encouraged, by the powers that be in OSCO and by the County.

109. The Defendant County has failed to implement proper policies and procedures to ensure that incarcerated individuals or those generally in the OCSO custody are not subject to such abuse. To the extent that any formal policies are in place, OSCO has failed to properly supervise and train its employees to follow them.

110. As a result of the foregoing policies, practices, and/or customs, the Defendant County has effectively deprived Plaintiff of his constitutional rights. The driving force behind the myriad abuses of incarcerated individuals in the County's facilities is a combination of its failure to properly staff its jails, train the individuals working there, and failure to keep the facilities in proper working order. Such policies, practices, and/or customs are a direct and proximate cause of both the conduct alleged herein as well as Plaintiff's injuries.

**e. <u>Defendants Saddock and Fodaro have a history of using excessive force</u>**

111. The Defendant County, through its agents OCSO and OCJC, as a matter of standard operating procedure and policy, have failed to take the steps necessary to put an end to the unlawful practices described herein and have failed to discipline or otherwise properly train and supervise the individuals engaged in such practices.

112.    The Defendant County has also failed to properly and adequately train its employees with respect to proper constitutional and statutory limitations on the exercise of their authority.

113.    The Defendant County has also failed to properly and adequately supervise and discipline its employees for their demonstrated propensity for excessive use of force and restraint and failure to protect those in their custody from the unlawful conduct of officers and deputies of OCSO and OCJC, thus effectively permitting the Individual Defendants to excessively detain and cause injury to Plaintiff in violation of his constitutional rights.

114.    In addition to the foregoing evidence of misconduct, the Defendant County was put on notice prior to July 27, 2024, that Defendant Saddock had a history of engaging in misconduct, including but not limited to, unlawful and otherwise unjustified acts of violence, based on events that occurred after Defendant Saddock began working for OSCO at OCJC. Notwithstanding such notice, the Defendant County failed to take any meaningful supervisory action or otherwise reasonable respond to Defendant Saddock's conduct, covered up his further misconduct, and left Defendant Saddock in a place to continue his pattern and practice of unconstitutional behavior.

115.    According to the New York State Court Electronic Filing System ("N.Y.S.C.E.F.") and the Northern District of New York ("N.D.N.Y") docket, Defendant Saddock has been named in four (4) other civil rights lawsuits alleging a variety of constitutional violations, including but not limited to, failure to intervene and excessive force. These cases include: *Jamell Works v. County of Onondaga et al.*, Index 000455/2025, filed January 15, 2025 in Onondaga County Supreme Court; *Deoz Miller Harris v. County of Onondaga et al.*, 22-cv-1363-AJB-DJS, filed January 15, 2022 in N.D.N.Y.; *Nyquest Allen v. County of Onondaga et al.*, 24-cv-332-LEK-TWD,

filed March 8, 2024 in N.D.N.Y.; and, *Saio Barzee v. Shelley et al.*, 24-cv-01360-MAD-PJE, filed November 8, 2024 in N.D.N.Y. All of these lawsuits are still pending.

116.    The Defendant County was additionally put on notice prior to July 27, 2024, that Defendant Fodaro had a history of engaging in misconduct, including but not limited to, unlawful and otherwise unjustified acts of violence, based on events that occurred after Defendant Fodaro began working for OSCO at OCJC. Notwithstanding such notice, the County failed to take any meaningful supervisory action or otherwise reasonable respond to Defendant Fodaro's conduct, covered up his further misconduct, and left Defendant Fodaro in a place to continue his pattern and practice of unconstitutional behavior.

117.    According to N.Y.S.C.E.F. and the N.D.N.Y docket, Defendant Fodaro has been named in three (3) other civil rights lawsuits alleging a variety of constitutional violations, including but not limited to, failure to intervene and excessive force. These cases include: *Jamell Works v. County of Onondaga et al.*, Index 000455/2025, filed January 15, 2025 in Onondaga County Supreme Court; *Deoz Miller Harris v. County of Onondaga et al.*, 22-cv-1363 (AJB-DJS), filed January 15, 2022 in N.D.N.Y.; *Saio Barzee v. Shelley et al.*, 24-cv-01360 (MAD-PJE), filed November 8, 2024 in N.D.N.Y.; and, *Vreeland v. Onondaga County Justice Center et al.*, 24-cv-521 (ECC-TWD), filed April 15, 2024 in N.D.N.Y. All of these cases are still currently pending.

118.    Upon information and belief, there were no meaningful investigations into a majority of these complaints, and certainly no attempt whatsoever by OCSO or the County of Onondaga to examine Defendant Saddock and/or Defendant Fodaro's conduct holistically. Put differently, despite extensive knowledge of this pattern of excessive force by Defendants Saddock and Fodaro against incarcerated individuals, the Defendant County took no effort, upon information and belief, to modify, increase, supplement, or otherwise intensify Defendant Saddock

and/or Defendant Fodaro's supervision, or to otherwise ensure that they would not engage in such blatant misconduct.

119.    The Defendant County's refusal to impose any discipline, to conduct any meaningful investigation, or to otherwise express even the slightest scintilla of concern that Defendants Saddock and/or Fodaro were prone to unnecessary and unjustifiable violence was a clear and unequivocal endorsement of their misconduct, that could only be understood as a ratification of their past misconduct, and an encouragement that they continue to use force in this fashion.

120.    Defendants Saddock and Fodaro's conduct towards Plaintiff constitutes a continuation of such violence and misconduct and is a direct and proximate cause of the constitutional violations alleged herein.

121.    These actions further reflect a policy, custom, and practice, or a ratification thereof through a demonstrated failure to act to curtail such behavior, and thus the aforesaid policies, procedures, regulations, practices and/or customs of the municipal defendant were, collectively and individually, a substantial factor in bringing about the aforesaid constitutional violations by the individual defendants generally, and Defendants Saddock and Fodaro in particular.

122.    The Defendant County's abdication of its duty to supervise its police officers, and its tacit, if not overt, endorsement of excessive force and similar misconduct, reflects its deliberate indifference to the established risks that such conduct poses to the public at large.

123.    The Defendant County's failure to act in the face of overwhelming evidence that Defendants Saddock and Fodaro were prone to excessive and unnecessary violence against civilians is evidence of its deliberate indifference to their demonstrated patterns of behavior, and

the very real risk that he would continue to engage in constitutional violations, such as the assault that they eventually committed against Plaintiff.

124.    Specifically, the deputies and sergeants employed at OCJC, including but not limited in particular to, Defendants Saddock and Fodaro, have a pervasive and longstanding practice of employing unnecessary and excessive force, unprovoked, and in situations where there is absolutely no threat to the officers and no force is necessary, as was the case here.

125.    By continually failing to address or attempt to remedy the harms committed by the Individual Defendants, and in failing to properly train, screen, supervise, and discipline the Individual Defendants, the Defendant County caused damage and injury to Plaintiff in violation of his rights.

126.    These repeated failures are demonstrative of the Defendant County's practice of deliberate indifference to the constitutional rights and basic dignity of its incarcerated population.

127.    As a result of the foregoing policies, practices, and/or customs, the Defendant County has subjected Plaintiff to unlawful violent treatment and deprived Plaintiff of his constitutional rights. The driving force behind the Individual Defendants' continued misconduct and use of force is a combination of the Defendant County's failure to properly staff its jails, train the individuals working there, and failure to keep the facilities in proper working order. Such policies, practices, and/or customs are a direct and proximate cause of both the conduct alleged herein as well as Plaintiff's injuries.

128.    Moreover, the Defendant County consistently fails to adequately train, supervise, and discipline its OCSO officers over such uses of force, resulting in repeated violations, often against people of color.

129.    As a direct and proximate result of the Defendant County's indifference towards the rights of Plaintiff and all incarcerated individuals within OCJC, as demonstrated above, Plaintiff was deprived of his federal, state, and/or other legal rights, and was caused to suffer physical and emotional pain and suffering, and a loss of human dignity.

130.    As a result, the County of Onondaga is liable for any damages caused, except for punitive damages.

**WHEREFORE**, Plaintiff demands the following relief jointly and severally against all of the Defendants:

a.    Compensatory damages;

b.    Punitive damages;

c.    The convening and empaneling of a jury to consider the merits of the claims herein;

d.    Costs and interest and attorney's fees;

e.    Such other and further relief as this court may deem appropriate and equitable.

Dated: New York, New York
          June 18, 2025

Rickner PLLC

By:

Sara Wolkensdorfer

14 Wall Street, Suite 4c
New York, New York 10005
Phone: (212) 300-6506
Fax: (888) 390-5401
*Attorney for Plaintiff*